UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ATISH NARAYAN,<br><br>Plaintiff,<br><br>v.<br><br>COMPASS GROUP USA, INC., a Delaware Corporation; and Does 1 through 25, inclusive,<br><br>Defendants. | No. 2:17-cv-00999-MCE-CKD<br><br>**MEMORANDUM AND ORDER** |

Plaintiff Atish Narayan ("Plaintiff") seeks redress from his former employer, Defendant Compass Group USA, Inc., ("Defendant" or "Compass"), for alleged disability discrimination, failure to accommodate, failure to engage in an interactive process, retaliation under both the Fair Employment and Housing Act ("FEHA") and the California Family Rights Act ("CFRA"), failure to prevent discrimination, and wrongful termination in violation of public policy. Currently before the Court is Defendant's Motion for Summary Judgment, or alternatively for summary adjudication. For the reasons set forth below, that Motion is DENIED.[1]

///

---

[1] Because oral argument was not of material assistance, the Court ordered this matter submitted on the briefs. E.D. Cal. Local Rule 230(g).

1

**BACKGROUND**

Canteen Vending Services ("Canteen"), a vending machine and refreshment services company with operations through the United States, is a business division of Defendant Compass. Statement of Facts ("SOF"), No. 1.[2] Plaintiff worked as a Vault Cashier for Canteen for some 32 years before being fired on February 23, 2017, allegedly because he could not perform the physical functions attendant to his position and no alternative accommodations could be made. As a Vault Cashier, Plaintiff was responsible for receiving, counting, storing, and dispensing cash and coins to the various drivers who stocked Canteen's vending machines. Id. at 4. This required some lifting of money bags that typically weighed some twenty-five pounds, but could weigh as much as fifty-five to sixty pounds. Id. at 8-9.

On October 15, 2015, Plaintiff sustained a workplace injury when he hit his left knee on the edge of a desk located within the vault. Id. at 11. An MRI taken on January 15, 2016 revealed a complex tear of the medial meniscus. Id. at 81. Plaintiff submitted a workers' compensation claim as a result of that injury, with that claim being processed and administered by Canteen's third-party workers' compensation administrator, Gallagher Bassett. Id. at 12. Plaintiff continued to work for six months but ultimately had to have surgery on his knee in April 2016. That surgery was performed by orthopedist Steven Barad, who placed Plaintiff on a medical leave of absence until August 1, 2016 to recuperate. Id. at 84.[3]

Although Plaintiff had no complaint about either the manner in which his leave was provided or how his worker's compensation claim was handled (id. at 17), emails

---

[2] The Statement of Facts in this includes not only Defendant's Statement of Undisputed Facts submitted in support of its Motion (ECF No. 34-2) but also Plaintiff's Response thereto, which both responds to Defendant's initial statement and includes additional disputed facts (ECF No. 36-1). Plaintiff submitted no response to those additional facts.

[3] According to the operative First Amended Complaint ("FAC"), Plaintiff applied for and obtained a medical leave of absence under the Family Medical Leave Act as well as its state law counterpart, the California Family Rights Act, through August 1, 2016. FAC at ¶ 22.

2

from Defendant's management beginning in June 2016 appeared to question his disability. Almon Smith, Defendant's Safety Manager for Sacramento Operations, stated in an email on June 14, 2016 to other management officials, including District General Manager Ken Legault (who supervised the location where Plaintiff worked), that "[t]hey [took] Atish off for another 45 days --- for a bumped knee."[4]  Id. at 101.

Plaintiff returned to full-duty status on August 1, 2016 as anticipated. His treating physicians at U.S. HealthWorks sent Defendant Work Status Reports indicating that Plaintiff could work without restriction. Id. at 88. There is no evidence that he did not perform all duties attendant to his position between returning to work post-surgery and the time of his termination. In fact, his treating doctors regularly sent Defendant progress reports confirming his ability to work without impairment. Management nonetheless expressed suspicion concerning Plaintiff's condition after he returned. Id. at 100. Ken Legault indicated in a September 15, 2016 email that "…. I don't understand how Atish['s] condition after surgery and rehab could [have] worsened." Id. at 103.

Plaintiff's workers' compensation claim for his work-related injury proceeded concurrently with the treatment regimen Plaintiff received as enumerated above. In connection with that claim, a Qualified Medical Examination ("QME")[5] was performed by Dr. Frank Minor in December 9, 2016, some four months after Plaintiff returned to full time work. Id. at 22. Dr. Minor's initial report indicated that Plaintiff had likely reached a permanent and stationary status with regard to his workplace injury. Id. at 92. After requesting additional medical records, Dr. Minor prepared a supplemental QME report on January 10, 2017 which included the following statement: "Mr. Narayan has returned to his usual and customary occupation. That being said, he is unable to kneel, squat, or

---

[4] Legault made this statement even though he knew that Plaintiff's surgery had been necessitated by an objectively verifiable injury: a torn meniscus. SOF at No. 89.

[5] A QME is a medical exam administered by a physician certified by the Division of Workers' Compensation – Medical Unit to examine injured workers, evaluate work-related disability, and write medical-legal reports. See Cal. Code Regs. tit. 8, § 11, Cal. Lab. Code § 4062.2.

3

run." Id. at No. 24. Dr. Minor's reports are silent as to any work restrictions he would place upon Plaintiff, and he testified at his deposition that he never identified any such restrictions. Minor Dep., Vol 1, 12:7-13:7; 20:22-21:14.[6] Significantly, too, Plaintiff's treating surgeon, Dr. Barad, issued another report on February 7, 2017, after Dr. Minor's supplemental QME report, which again reaffirmed that Plaintiff was released to return to full-time duty. SOF at No. 97.

Plaintiff's QME was furnished to Gallagher Bassett, the third-party vendor entrusted by Canteen with administering its workers' compensation claims. A Gallagher employee, Polly Paugh, then forwarded the report to Plaintiff's supervisor, Ken Legault. Ms. Paugh had previously responded to Mr. Legault's concerns about Plaintiff's post-surgical condition by indicating that "…. I think this employee is exaggerating his injury, but we will find out once a [workers' compensation examination] is completed." Id. at 104. Even though Dr. Barad had just reiterated Plaintiff's ability to return to work without restriction by report dated February 7, 2017, once Defendant's management received the QME report, they decided over the course of just a couple of conference calls that they could not accommodate the disability allegedly evinced by the QME.[7] Plaintiff was consequently terminated on February 23, 2017. No attempt was made to reconcile the apparent discrepancy between the views of Plaintiff's treating doctors, who had released Plaintiff to full-time duty, and those of the workers' compensation evaluator, whose statements management interpreted as meaning Plaintiff could not perform the duties attendant to his position. Dr. Minor testified that no one from the company called him to ask whether he in fact considered Plaintiff unable to work. Minor Dep. Vol 1, 22:9-24.

Plaintiff states he tried to contact Julie Cobb, Defendant's Vice President of Human Resources and the individual allegedly responsible for the decision, telling her
///

---

[6] Plaintiff's counsel lodged transcripts of all pertinent deposition transcripts obtained in this matter for the Court's review.

[7] Plaintiff has also cited evidence that Legault determined within the space of eleven minutes that Plaintiff could not perform any other jobs at the company. Legault Dep., 163:17-165:12.

that he could do his work[8] and that his treating doctor had confirmed his ability in that regard, but Ms. Cobb nonetheless refused to change the company's position. Id. at 37, 43. Cobb testified she believed she could rely on the QME and did not need to review the medical reports from Plaintiff's treating providers stating that Plaintiff could work without restriction. Cobb Dep., 59:19-61:25. According to Ms. Cobb, irrespective of what any other medical report indicated, because the "QME report said what it said," no other such report would have mattered. Id. at 124:15-132:11; SOF at No.132. Even Defendant's former Human Relations Representative, Kevin Crockett, who had been involved in the case, testified that the QME reports juxtaposed against Dr. Barad's opinion would have "merit[ed] more questions, adding that as an HR professional I would probably want more answers…." SOF at No. 119.

Given all of the foregoing, Plaintiff initiated this action including various claims for disability discrimination, failure to accommodate, failure to engage in an interactive process and retaliation. Defendant now moves for summary judgment essentially on grounds that because the QME said that Plaintiff could not kneel, squat or run, and because his Vault Cashier position allegedly required those activities, it was justified in firing Plaintiff with no real interactive process whatsoever (aside from a couple of conference calls between a couple of members of management in which it was decided that no alternative position was available, despite the fact that Defendant is a global employer with some 270,000 employees).

The QME doctor himself, Dr. Minor, issued another supplemental report on July 10, 2017, shortly after this lawsuit was initially filed. At that point, Dr. Minor clarified: "I fail to see that I put any restrictions on Mr. Narayan and his ability to work. I agreed with Dr. Barad that he is capable of returning to his usual and customary occupation." SOF at 99. At deposition, Dr. Minor expressed displeasure that Defendant had

---

[8] Plaintiff testified that he told Julie Cobb that in the rare circumstances where kneeling, crouching or stooping was required he could do those activities. Id. at 127. Even Defendant's Job Description for Plaintiff's position stated only that the "employee is occasionally required to … stoop, kneel, crouch or crawl . . . " Id. at 129.

5

1 | interpreted his conclusions as indicating that Plaintiff could not work when that was not
2 | the case.  Minor Dep., Vol 1: 14:23-15:14.

**STANDARD**

The Federal Rules of Civil Procedure provide for summary judgment when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986).  One of the principal purposes of Rule 56 is to dispose of factually unsupported claims or defenses.  Celotex, 477 U.S. at 325.

Rule 56 also allows a court to grant summary judgment on part of a claim or defense, known as partial summary judgment.  See Fed. R. Civ. P. 56(a) ("A party may move for summary judgment, identifying each claim or defense—or the part of each claim or defense—on which summary judgment is sought."); see also Allstate Ins. Co. v. Madan, 889 F. Supp. 374, 378-79 (C.D. Cal. 1995).  The standard that applies to a motion for partial summary judgment is the same as that which applies to a motion for summary judgment.  See Fed. R. Civ. P. 56(a); State of Cal. ex rel. Cal. Dep't of Toxic Substances Control v. Campbell, 138 F.3d 772, 780 (9th Cir. 1998) (applying summary judgment standard to motion for summary adjudication).

In a summary judgment motion, the moving party always bears the initial responsibility of informing the court of the basis for the motion and identifying the portions in the record "which it believes demonstrate the absence of a genuine issue of material fact."  Celotex, 477 U.S. at 323.  If the moving party meets its initial responsibility, the burden then shifts to the opposing party to establish that a genuine issue as to any material fact actually does exist.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986); First Nat'l Bank v. Cities Serv. Co., 391 U.S. 253, 288-89 (1968).

///

In attempting to establish the existence or non-existence of a genuine factual dispute, the party must support its assertion by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits[,] or declarations . . . or other materials; or showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1). The opposing party must demonstrate that the fact in contention is material, i.e., a fact that might affect the outcome of the suit under the governing law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 251-52 (1986); Owens v. Local No. 169, Assoc. of W. Pulp and Paper Workers, 971 F.2d 347, 355 (9th Cir. 1987). The opposing party must also demonstrate that the dispute about a material fact "is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In other words, the judge needs to answer the preliminary question before the evidence is left to the jury of "not whether there is literally no evidence, but whether there is any upon which a jury could properly proceed to find a verdict for the party producing it, upon whom the onus of proof is imposed." Anderson, 477 U.S. at 251 (quoting Improvement Co. v. Munson, 81 U.S. 442, 448 (1871)) (emphasis in original). As the Supreme Court explained, "[w]hen the moving party has carried its burden under Rule [56(a)], its opponent must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita, 475 U.S. at 586. Therefore, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" Id. at 587.

In resolving a summary judgment motion, the evidence of the opposing party is to be believed, and all reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. Anderson, 477 U.S. at 255. Nevertheless, inferences are not drawn out of the air, and it is the opposing party's obligation to produce a factual predicate from which the inference may be drawn.
///

Richards v. Nielsen Freight Lines, 602 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), aff'd, 810 F.2d 898 (9th Cir. 1987).

**ANALYSIS**

**A. First Cause of Action: Disability Discrimination in Violation of FEHA**

The FEHA prohibits discriminatory discharge stemming from an employee's actual disability, or the employer's perception that he or she is disabled, if the employee can otherwise perform with reasonable accommodations. Cal. Gov. Code § 12940. Under subdivision (a) of the statute, it is an unlawful employment practice to discharge an employee based on a disability, with the term disability being defined in § 12926(o) as including a perception that an employee has any characteristics that make him disabled. FEHA also explicitly declares its legislative intent as providing "protection when an individual is erroneously or mistakenly believed to have any physical . . . condition . . . " even if he or she actually does not. Id. at § 12926.1

A three-step burden shifting framework, first enunciated by the United States Supreme Court in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973) is generally used to assess discrimination claims in the absence of direct evidence of discrimination. Scotch v. Art Institute of California, 173 Cal. App. 4th 986, 1004-05 (2009). Under the so-called McDonnell Douglas test, a plaintiff must make a prima facie case of discrimination by producing evidence that he or she 1) was either disabled or perceived to be disabled; 2) was qualified for the position with the requisite skills to perform its essential functions with or without accommodations; 3) suffered an adverse employment action like discharge that was (4) substantially motivated by the plaintiff's disability or perceived disability. Id. (citing Guz v. Bechtel National, Inc., 24 Cal. 4th 317, 355 (2000); see also Nadaf-Rahrov v. Neiman Marcus Group, Inc., 166 Cal. App. 4th 952, 962 (2008). If the required prima facie showing is made, a presumption of discrimination arises and the burden shifts to the employer to rebut that presumption with evidence of a

legitimate, non-discriminatory reason for its adverse action against the employee. Scotch, 173 Cal. App. 4th at 1004-05. Finally, if that burden is met, the employee must then offer evidence that the reasons proffered by the employer to justify its decision were mere pretexts. Id.

Applying the McDonnell Douglas analysis to the present case, there appears to be no dispute that, at the very least, Defendant perceived Plaintiff to be disabled, thereby satisfying McDonnell Douglas' first step. Defendant nonetheless claims that Plaintiff cannot make a prima facie case of discrimination because he cannot overcome the second hurdle of demonstrating he could perform the essential duties of the Vault Cashier position, either with or without accommodation. To support that argument, Defendant relies solely on the one sentence contained in Dr. Minor's supplemental report to the effect that Plaintiff could not kneel or squat. According to Defendant, because Plaintiff's position sometimes required him to bend to lift money bags, that purported restriction made him unable to perform the tasks attendant to his position.

Defendant's blind adherence to the QME report ignores substantial evidence to the contrary. First, Plaintiff argues that instances where he actually had to do activities involving kneeling, crouching or stooping were "rare," and that when he needed to he could in fact perform those maneuvers. SOF at No. 127. His contention is amply supported by the fact that Plaintiff had been doing the duties required as a Vault Cashier, without complication, during the six-month period that intervened between his post-surgery return to work and the date of his termination on February 23, 2017. Id. at 126. The validity of Plaintiff's argument is further underscored by the fact that his treating medical care providers, including the surgeon that actually performed Plaintiff's knee operation, sent Defendant multiple letters confirming Plaintiff's ability to return to full-time work with no restrictions. Id. at 88, 97. Making all inferences in favor of Plaintiff, the Court believes Plaintiff has adequately demonstrated his ability to perform his job duties.

///

9

1    Under the third prong of the McDonnell Douglas calculus, there is no doubt that
2    Plaintiff's discharge constitutes an adverse employment action, which leads the Court to
3    the final question: whether Plaintiff's termination was substantially motivated by either
4    his actual or perceived disability. Again, there seems to be no question as to that score
5    either. Indeed, the letter provided to Plaintiff the day he was fired stated explicitly that he
6    was being terminated because Defendant could not accommodate the "work restrictions"
7    that "prevented him from performing the essential functions of the position." Id. at 34.
8    For current purposes, Plaintiff has adequately shown that his perceived disability was the
9    driving factor behind his termination.

10   The burden thus shifts back to Defendant to offer a legitimate, non-discriminatory
11   reason for its termination decision. This factor too does not militate in Defendant's favor.
12   Seizing on a single paragraph in Dr. Minor's Supplemental QME report, Defendant's
13   management failed even to reach back out to Dr. Minor himself to resolve the apparent
14   conflict between his statement and the statements of the treating physicians.[9] It seems
15   a simple phone call would have prevented Plaintiff's termination and this lawsuit, since
16   Dr. Minor has since bluntly clarified he did not "put any restrictions on Mr. Narayan and
17   his ability to work" (id. at 99); nor was he pleased that Defendant had purportedly
18   misinterpreted his conclusions.

19   ///
20   ///
21   ///
22   ///
23   ///
24   ///
25   ///

---

[9] While Defendant argues that the decision in Nealy v. City of Santa Monica, 234 Cal. App. 4th 359 (2014) is directly on point, the Court disagrees. In Nealy, the court found that the employer's reasonable interpretation of the QME report foreclosed any genuine dispute about whether he could do his job. Id. at 368, 376-77. Here, unlike Nealy, it is highly questionable whether Defendant's interpretation of the QME report was reasonable under the circumstances.

10

The obvious question becomes why Defendant rushed to judgment on the basis of an equivocal statement by a workers' compensation evaluator[10] that was contradicted not only by Plaintiff's own treating providers but by Plaintiff's own demonstrated ability to do the job. Why did Defendant terminate Plaintiff without any further inquiry, without talking to Plaintiff himself about whether he could do the job, and after only a small number of relatively short phone calls? On this record, Defendant's responsive rationale, that Plaintiff simply could not do the job, cannot carry the day because there is ample evidence to the contrary. To that end, a number of facts support Plaintiff's argument that Defendant's stated reasons for his termination were pretextual. As indicated above, despite Plaintiff's injury being objectively verifiable, Almon Smith described Plaintiff's torn meniscal tear as merely a "bumped knee." SOF at No. 89. In addition, for his part, Ken Legault also expressed suspicion about Plaintiff's condition after he returned to work. Id. at 103. Finally, and perhaps most tellingly, Defendant flatly refused to consider any evidence inconsistent with its own conclusion that Plaintiff could no longer work as a Vault Cashier. Based on the foregoing, Defendant has not shown it is entitled to judgment as a matter of law. Defendant's request for summary adjudication as to Plaintiff's First Cause of Action, for Disability Discrimination under FEHA, is thus DENIED.

### B. Second Cause of Action: Failure to Accommodate in Violation of FEHA

A failure to reasonably accommodate an employee who is either disabled, or perceived to be disabled, is an unlawful employment practice violative of FEHA.

---

[10] It bears noting that the workers' compensation system itself, under which the QME was prepared, was designed to compensate employee's for work-related injuries that have permanent consequences. The term "permanent and stationary, as used by the QME pursuant to workers' compensation parlance, is therefore a term of art signaling only that a worker's injury stabilized and that he or she is no longer making improvement at a given point in time. See Gelfo v. Lockheed Martin Corp., 140 Cal. App. 4th 34, 48 (2006). It does not mean that a person is never going to improve. Id. "Rather, the restrictions imposed for a permanent and stationary worker are prophylactic, intended to help avoid re-injury." Id. This may explain both the seeming inconsistency in Dr. Minor's QME report, as well as his umbrage in discovering that a workers' compensation rating analysis had been used to preclude a patient from working when he had made no such statement.

11

Cal. Gov. Code § 12940(m); A.M. v. Albertsons, LLC, 178 Cal. App. 4th 455, 463-64 (2009).

> The essential elements of a failure to accommodate claim are: (1) the plaintiff has a disability covered by the FEHA; (2) the plaintiff is a qualified individual (i.e., he or she can perform the essential functions of the position); and (3) the employer failed to reasonably accommodate the plaintiff's disability.

Cuiellette v. City of Los Angeles, 194 Cal. App. 4th 757, 766 (2011); Taylor v. Trees, Inc., 58 F. Supp. 3d 1092, 1111 (E.D. Cal. 2014).

FEHA requires that accommodations be made for either known or perceived disabilities of employees in enabling them to perform a position's essential functions, unless doing so would produce undue hardship to the employer's operations. Cal. Gov. Code § 12940(a)(1)-(2), (m); A.M., 178 Cal. App. 4th at 463. The term "reasonable accommodation," as used in the statute, constitutes a meaningful, flexible and affirmative duty to accommodate disability. See Sargent v. Litton Systems, Inc., 841 F. Supp. 956, 962 (N.D. Cal. 1994). Significantly for purposes of the present matter, in assessing what accommodations are appropriate, an employer cannot simply point to medical reports that have been generated to escape liability under FEHA; it "cannot slavishly defer to a physician's opinion without first pausing to assess the objective reasonableness of the physician's conclusions.'" Gelfo, 140 Cal. App. 4th at 49 n.11. As already explained in detail above, Plaintiff has offered evidence that "slavishly defer" is just what Defendant did. If Defendant had looked past the QME report, it may have discovered that Plaintiff in fact needed no accommodations. Even if Plaintiff had required some accommodation, a trier of fact could conclude on this record that Defendant made no attempt to accommodate him.

In sum, Plaintiff has offered evidence that, if accepted by the trier of fact, supports this claim. Defendant's motion is DENIED as to this cause of action as well.

///
///
///

### C. Third Cause of Action: Failure to Engage in Interactive Process in Violation of FEHA

Under California law, an employer must engage in a "timely, good faith interactive process. . . in response to a request for reasonable accommodation by an employee or applicant with a known physical or mental disability or known medical condition." Cal. Gov. Code § 12940(n). A failure to so engage constitutes an unlawful employment practice under FEHA, and independent of liability for other FEHA claims. Wysinger v. Automobile Club of Southern California, 157 Cal. App. 4th 413, 424 (2007). Triggering employer's obligation to engage in this regard requires no special request; it simply arises once the employer becomes aware of the need to consider an accommodation. Scotch, 173 Cal. App. 4th at 1013; Cal. Code regs., tit 2, § 11069(b). The employer must accordingly explore various accommodations even in the absence of a specific request from the employee. Moreover, "for the process to work '[b]oth sides must communicate directly, exchange essential information and neither side can delay or obstruct the process.'" Nadaf-Rahrov, 166 Cal. App. 4th at 984-85.

Defendant was clearly aware of its obligations because they were set forth in its own Employee Handbook. Section 4.3 of the Handbook states unequivocally that the company "will engage in an interactive process with any Applicant or Associate that requests assistance of a reasonable accommodation under the Americans with Disabilities Act ('ADA') or any other federal state, or local law." SOF at No. 111. Despite this, and again as articulated above, Plaintiff offers evidence that Defendant wholly avoided its obligations. The Court fails to see how Defendant might show how its process was interactive, if Plaintiff was excluded from Defendant's discussions.[11] Plaintiff's Third Cause of Action consequently also survives summary judgment.

///

///

---

[11] Defendant's argument that any process would have been futile because he couldn't perform the job is belied by the record.

13

### D. Fourth and Sixth Causes of Action: Retaliation in Violation of FEHA and/or CFRA

FEHA prohibits any retaliation against an employee in response to a request for accommodation. Cal. Gov. Code § 12940(m)(2). To establish retaliation under FEHA, the employee must show that he was engaged in protected activity (here, for example, by requesting a medical leave of absence), and that he was subsequently subjected to an adverse employment action (i.e. discharge) that was substantially motivated by that activity. Moore v. Regents of the University of California, 248 Cal. App. 4th 216, 244 (2016). Similarly, it is an unlawful employment practice pursuant to CFRA for an employer to discharge, discriminate against, or interfere with an employee's exercise of the right to medical leave. Cal. Gov't Code § 12945.2(l); Cal. Code Regs., tit 2, § 11094(b).

> The elements of a cause of action for retaliation in violation of CFRA are: 1) the defendant was an employer covered by CFRA; (2) the plaintiff was an employee eligible to take CFRA leave, (3) the plaintiff exercised [his] right to take [leave] for a qualifying CFRA purpose; and (4) the plaintiff suffered an adverse employment action, such as termination, fine or suspension, because of [his] right to CFRA [leave].

Moore, 248 Cal. App. 4th at 248.

Not surprisingly, FEHA and CFRA claims are analyzed similarly: for both, the McDonnell Douglas burden shifting analysis applies. Id. at 244, 248. In addition, close temporal proximity between an employee's protected conduct and an adverse employment action may support an inference that the action was retaliatory. Rope v. Auto-Chlor Systems of Washington, 220 Cal. App. 4th 635, 653 (2013) (abrogated by statute on other grounds).

For the reasons already articulated, Defendant's motion fails as to these causes of action as well. Plaintiff points to evidence that Defendant's management and supervisory employees questioned Plaintiff's injury as just a "bumped knee" and expressed suspicion that he was exaggerating. SOF No. 101, 103-05. Those comments give rise to an inference that management targeted Plaintiff in retaliation for

him filing what they believed was an unwarranted claim, which is enough to preclude summary judgment in Defendant's favor on either the Fourth or Sixth Causes of Action.

### E. Fifth Cause of Action: Failure to Prevent Discrimination in Violation of FEHA

FEHA's anti-discrimination and anti-retaliation mandates have a companion provision forbidding any failure "to take all reasonable steps necessary to prevent discrimination and harassment." Cal. Gov. Code § 12940(k). That obligation is both affirmative and mandatory. Northrop Grumman Corp. v. Workers' Comp. Appeals Bd., 103 Cal. App. 4th 1021, 1035 (2002). "Prompt investigation of a discrimination claim is a necessary step by which an employer meets its obligation to ensure a discrimination-free work environment." Id. (citing, e.g., Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 676 (10th Cir. 1998). Preventive action, if any, must be reasonably calculated to end the discrimination or retaliation. Id. at 676.

Again, triable issues of fact support Plaintiff's claim. As enumerated above, Plaintiff has pointed to ample evidence suggesting that Defendant failed to take steps necessary to prevent Plaintiff's allegedly retaliatory and discriminatory termination. Defendant failed to investigate and/or clarify the apparent contradiction in Dr. Minor's supplemental QME report, let alone how his apparent opinion meshed with the fact that Plaintiff's own treating doctors had released him to return to work with no restrictions and Plaintiff had actually been performing his job without incident for some six months. Moreover, Julie Cobb, Defendant's Vice President of Human Resources, failed to take any steps in response to Plaintiff's termination even after Plaintiff sent a detailed email pointing out the fact that Plaintiff had been released to work by his own treating providers and had been performing all job duties attendant to his position since returning to work in August of 2016. Defendant's request for summary adjudication of Plaintiff's Fifth Cause of Action is DENIED.

///

///

### F. Seventh Cause of Action: Wrongful Termination

"[W]hile an at-will employee may be terminated for no reason, or for an arbitrary or irrational reason, there can be no right to terminate for an unlawful reason or a purpose that contravenes fundamental public policy." Silo v. CHW Med. Found., 27 Cal. 4th 1097, 1104 (2002). Discharge for those prohibited reasons constitutes wrongful termination. Wrongful termination requires the following showing: 1) an employer-employee relationship; 2) termination or other adverse employment action; 3) a violation of public policy; 4) causation; and 5) damages. See, e.g., Holmes v. General Dynamics Corp., 17 Cal. App. 4th 1418, 1426 (1993). This derivative claim rises and falls with the foregoing claims already found to have survived summary judgment, as enumerated above, and Defendant's Motion is thus DENIED as to this claim as well.

### G. Eighth Cause of Action: Declaratory Relief

Plaintiff's Eighth Cause of Action purports to request declaratory judgment under both FEHA and California Code of Civil Procedure § 1060. As Defendant points out in requesting summary adjudication of the claim, however, a separate claim for declaratory relief does not lie to adjudicate an issue subject to determination in the underlying tort action. Cal. Ins. Guarantee Assn v. Superior Court, 231 Cal. App. 3d 1617, 1627 (1991). Plaintiff appears to concede that while he may request declaratory relief pursuant to his underlying causes of action, he may not do as an independent cause of action. See Pl.'s Opp., p. 20. n.13. Accordingly, Plaintiff's Eighth Cause of Action is STRICKEN, and Defendant's motion as to this claim is DENIED as moot.

### H. Punitive Damages

Employer liability for punitive damages requires a showing of malice, oppression or fraud by an officer, director, or managing agent who had advance knowledge of, authorized, ratified, or was personally guilty of the malicious, oppressive of fraudulent conduct. Cal. Civ. Code § 3294(a)-(b). Plaintiff bears the burden of proving, by clear and convincing evidence, that such conduct rising to the level of oppression, fraud or

16

malice occurred.  Rangel v. Am. Med Response W., No. 1:09-cv-01467-AWI, 2013 WL 1785907 at *26-35 (E.D. Cal. 2013); Aquino v. Superior Court, 21 Cal. App. 4th 847-856-57 (1993).  In order to do so, Plaintiff must present evidence of "despicable conduct" on Defendant's part that was carried out in conscious disregard of his rights.  Stewart v. Truck Ins. Exchange, 17 Cal. App. 4th 468, 483 (1993).  Despicable conduct is described as conduct "so vile, base, contemptible, miserable, wretched or loathsome that it would be looked down upon and despised by ordinary decent people…" American Airlines Inc. v. Sheppard, Mullin, Richter & Hampton, 96 Cal. App. 4th 1017, 1050 (2002).

The facts presented to the Court with all inferences taken in Plaintiff's favor could absolutely lead a trier of fact to award punitive damages.  Defendant's Motion is DENIED.

**CONCLUSION**

For all the foregoing reasons, Defendant's Motion for Summary Judgment (ECF No. 34) is DENIED in its entirety.

IT IS SO ORDERED.

DATED: March 10, 2020

_____
MORRISON C. ENGLAND, JR.
UNITED STATES DISTRICT JUDGE